[Cite as *In re C.C.*, 2011-Ohio-3357.]

STATE OF OHIO      )
                   )ss:
COUNTY OF SUMMIT   )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: C. C.
      M. C.

C.A. No.     25835

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 08-09-736
               DN 09-07-555

DECISION AND JOURNAL ENTRY

Dated: July 6, 2011

WHITMORE, Judge.

{¶1} Appellant, Jawanda C. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to two of her minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I

{¶2} Mother is the natural mother of four children, who ranged in age from two months to twelve years at the time of the permanent custody hearing. Although Mother did not have custody of any of her children, only the middle two were at issue in this case because her oldest child was in the legal custody of her maternal grandmother and the youngest child was born after CSB filed the motion for permanent custody. This appeal involves the termination of Mother's parental rights to C.C., born October 17, 2005, and M.C., born May 2, 2009.

{¶3} Mother has a history of involvement with CSB dating back to 2000. Mother and the maternal grandmother had repeatedly accused each other of abusing and/or neglecting Mother's oldest child, J.C. Mother relied on the maternal grandmother and other relatives to help care for J.C., and sometimes left her with the grandmother for months at a time while she lived elsewhere. Despite Mother's allegations about the grandmother, she continued to leave J.C. in her care and eventually placed J.C. in the grandmother's legal custody because the child had behavioral problems and Mother could not handle her.

{¶4} Although Mother also left her younger child, C.C., with the grandmother for temporary periods of time, she maintained legal custody of him until September 2008, when she asked CSB to take him. Mother was homeless, suffering from mental health problems, and could not meet the child's basic needs. She had attempted suicide five months earlier and, although she had been hospitalized and received mental health treatment at that time, she had not continued with treatment. Consequently, on September 5, 2008, CSB filed a complaint, alleging that C.C. was a dependent child. With the advice of counsel, Mother agreed to allow C.C. to remain in CSB custody and later stipulated to an adjudication that that C.C. was a dependent child.

{¶5} M.C. was born May 2, 2009. CSB did not immediately file a dependency complaint because Mother and M.C. were living in suitable locations and Mother was meeting the child's basic needs. Two months after M.C. was born, however, Mother moved in with M.C.'s father, who had serious mental health problems and a history of violence toward Mother. CSB filed a dependency complaint, and M.C. was removed from Mother's custody. M.C. was later adjudicated a dependent child.

{¶6} During the first year of this case, Mother made little progress on the reunification goals of the case plan. She lived in eight different locations during that time, and often lived with people who posed a risk to her or her children. Although Mother initially told her caseworker that her mental health issues were not a priority for her, she later obtained a mental health assessment and engaged in counseling. She eventually obtained suitable, independent housing and stable employment. Consequently, at the end of January 2010, the trial court returned both children to Mother's custody under an order of protective supervision.

{¶7} For the next few months, CSB believed that Mother was providing a suitable home for her children. Unbeknownst to the agency, however, Mother was leaving the children with inappropriate caregivers while she went to work. She first enlisted the help of the maternal grandmother, who also suffers from mental health problems and with whom Mother had a relationship that her counselor described as unstable and unhealthy. According to Mother, the grandmother had a short temper and frequently had been verbally and physically abusive to her, her sister, and her children. Despite the grandmother's temper and abusive tendencies, Mother continued to rely on her to care for her children. Mother briefly stopped relying on the grandmother for child care after the she allegedly slapped eight-month-old M.C. because she was crying. Less than two months later, however, Mother was allowing the grandmother to babysit the children again.

{¶8} More significantly, unbeknownst to CSB, Mother started dating a man named Rafael in February 2010 and allowed him to watch her children while she was at work. On May 22, 2010, Mother left both children in Rafael's care during her eight-hour work shift. When she returned home, M.C. was unresponsive, so she called 911. M.C. was transported to Akron Children's Hospital, where doctors determined that she had sustained a brain bleed and retinal

hemorrhaging that day and that she had sustained similar injuries approximately seven to ten days earlier. An investigation revealed that M.C. had been violently shaken and that Rafael was the perpetrator of the abuse. Both children were removed from Mother's care and returned to the temporary custody of CSB.

{¶9} For the next several months, Mother refused to believe that Rafael had harmed M.C. She was pregnant with Rafael's child and continued her relationship with him. Eventually, Mother told her caseworker that she accepted that Rafael had abused M.C. and that she had ended her relationship with him because she needed to protect her children. After her youngest child was born in December 2010, however, Mother asked a friend to invite Rafael to visit the baby at the hospital, even though she knew that his visit was in violation of a no contact order. She even let him hold the baby because "it's his daughter." The caseworker expressed disappointment that Mother had not learned from her recent months of counseling that she needed to keep Rafael away from her children.

{¶10} Before the birth of Mother's youngest child, CSB moved for permanent custody of C.C. and M.C. Following a hearing on the motion, the trial court found that C.C. had been in the temporary custody of CSB for more than 12 of the 22 months prior to hearing, that Mother's chronic mental illness was so severe that it prevented her from providing a suitable home for M.C., and that permanent custody was in the best interests of both children. Mother appeals and raises three assignments of error, which will be consolidated and rearranged for ease of discussion.

II

Assignment of Error Number Two

"THE DECISION OF THE TRIAL COURT TO GRANT PERMANENT CUSTODY TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶11} Mother argues that the trial court's permanent custody decision was against the manifest weight of the evidence. We disagree.

{¶12} Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 99.

{¶13} The trial court found that the first prong of the test was satisfied for C.C. because he had been in the temporary custody of CSB for at least 12 of the prior 22 months. Mother does not contest that finding. M.C. had not been in the temporary custody of CSB for twelve months when CSB filed its motion. The trial court found that the evidence satisfied the first prong of the test to terminate Mother's parental rights to M.C. because Mother had a chronic mental illness that was so severe that it prevented her from providing M.C. an adequate permanent home at that time or within the following year. See R.C. 2151.414(E)(2). The evidence before the trial court supported that finding.

{¶14} Mother had been diagnosed with borderline personality disorder, which her counselor described as chronic, enduring, and incurable. Her behavior exhibited many of the characteristic symptoms of the disorder, according to the psychologist who diagnosed her and another psychologist who counseled her. The psychologist who counseled her testified at the hearing that Mother's borderline personality disorder was characterized by her history of suicidal behavior, unstable relationships, impulsivity, and inability to regulate her emotions.

{¶15} In addition to her suicide attempt shortly before this case began, Mother had attempted suicide on two prior occasions. Although she received mental health treatment after each suicide attempt, she had not continued with the ongoing mental health treatment that she needed. Instead, she had seen several different counselors for brief periods for over a decade. At the time of the permanent custody hearing, Mother had engaged in only nine sessions with her current counselor. The counselor testified that she would need to continue to see Mother on a weekly basis and that her progress in counseling had been only "adequate."

{¶16} The psychologist who diagnosed Mother explained that she could not provide a suitable home for her children unless and until she learned through counseling how to improve her judgment and coping skills. Despite months of counseling, however, Mother had made little progress toward those goals. Her behavior continued to demonstrate that she had made little progress toward resolving her pattern of using poor judgment by engaging in unstable relationships and placing her children at risk by exposing them to inappropriate people. M.C. was twice removed from her care due to her failure to make appropriate decisions about whom she exposed her children to.

{¶17} Mother continued to rely on the maternal grandmother to help care for her children, despite the fact that they had a relationship that was admittedly strained and

dysfunctional. The grandmother had been diagnosed with major depressive disorder with psychotic features and, according to Mother, she had a volatile temper. Mother told the caseworker and her counselor that she did not have a good relationship with the grandmother because she had physically and verbally abused both Mother and her sister when they were children. Despite Mother's allegations about the grandmother, Mother lived in her home with her oldest two children at one time and frequently left the children with her for months at a time. She later allowed the grandmother to take legal custody of her oldest child, although she believed that the child was unhappy there. Even after the grandmother allegedly smacked eight-month-old M.C. because she was crying, Mother allowed the grandmother to babysit her two young children. At the time of the permanent custody hearing, the grandmother was expressing interest in taking legal custody of the children. It was unclear whether Mother supported that placement, as some witnesses said she did, but Mother's testimony on that topic was ambivalent.

{¶18} In addition to her poor choice to leave her children in the care of the maternal grandmother, Mother admitted that she had allowed her children to have close and repeated contact with two violent men, the father of M.C. and Rafael, the father of her youngest child. The father of M.C. was violent with Mother, but she lived with him with M.C. until CSB removed the child from the home. Mother apparently continued living with M.C.'s father until he threatened to kill her. She later allowed Rafael, whom she barely knew, to care for the children. He violently shook M.C. on at least two occasions, causing bruising of the child's body and bleeding on the brain.

{¶19} CSB had serious concerns about Mother's ability to protect her children from harm because she continued to exhibit poor insight and judgment. After months of counseling, Mother demonstrated her lack of progress by continuing her relationship with Rafael and inviting

him to visit and hold her newborn infant at the hospital, just one month before the permanent custody hearing. Although Mother testified that she would not put any man ahead of her children, her behavior continued to demonstrate otherwise.

{¶20} Mother had engaged in counseling to address her mental illness again and again over the years, but her behavior demonstrated that she continued to lack the insight into making appropriate decisions about how to protect her children. Mother had repeatedly exposed M.C. to the risk of serious harm, and the child had actually suffered serious harm due to Mother's poor insight. It was apparent from her own testimony that she did not grasp the significance of the risky choices she had made. The evidence before the trial court demonstrated that, due to her chronic mental illness, Mother was unable to provide a safe home for M.C. at that time or within the coming year.

{¶21} Mother also challenges the trial court's finding that permanent custody was in the best interests of the children. When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

"(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

"(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

"(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ***;

"(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(a)-(d).[1]

---

[1] The factor set forth in R.C. 2151.414(D)(1) (e) is not relevant in this case.

{¶22} Mother's interaction with her children was limited throughout most of this case to supervised visits at the visitation center. The caseworker testified that, although Mother regularly attended visits during the early part of the case, her attendance later became a problem. Mother told the caseworker that she did not want to visit the children at the visitation center, so she did not attend visits regularly and eventually stopped coming. At the time of the hearing, Mother had not seen her children for approximately three months.

{¶23} When the caseworker contacted Mother about missing visits, Mother told her that as long as she could speak to the children on the phone (one of whom was less than two years old), that was good enough for her. The guardian ad litem also noted that, although Mother sometimes had medical reasons for missing visits with her children, she had made little effort to regularly attend visits and repeatedly asked CSB to relocate the visits to a location that was more convenient for her.

{¶24} Although C.C. had expressed to others that he did not want to return to Mother's home, because he was only five years old at the time of the hearing and M.C. was less than two, the guardian ad litem spoke on behalf of both children. He opined that permanent custody to CSB would be in the best interests of both children. He emphasized that, although Mother appeared to love them, she lacked the ability to care for them without assistance from others and she had repeatedly exposed them to serious risks of harm by selecting inappropriate caregivers for them.

{¶25} At the time of the hearing, both children had been in the temporary custody of CSB for most of their young lives. When the children did live with Mother, she repeatedly left them in the care of inappropriate caregivers. M.C. had sustained serious injuries after twice being abused by Rafael. She was also allegedly smacked by the maternal grandmother simply

because she was crying. Despite Mother's acknowledgement that both Rafael and the grandmother had put her children at risk of harm, she continued to allow them to be around her children.

{¶26} Both children had been in and out of Mother's home and were in need of a legally secure permanent placement. Although CSB had considered the maternal grandmother as a potential placement for the children, it concluded that she was not a suitable placement for these young children, especially M.C. who had special needs following the trauma to her brain. The grandmother took psychiatric medication that made her very sleepy and was already providing fulltime care for Mother's oldest child and her own sister, both of whom had special needs. There were also allegations by Mother that the grandmother had a history of using inappropriate physical and verbal discipline. CSB had found no other relatives who were able to take custody of the children and Mother was not able to do so. Consequently, the trial court reasonably concluded that a legally secure placement could only be achieved by placing the children in the permanent custody of CSB.

{¶27} There was ample evidence before the trial court to support its conclusions that C.C. had been in the temporary custody of CSB for more than 12 of the prior 22 months, that Mother's chronic mental illness prevented her from providing an adequate home for M.C., and that permanent custody was in the best interests of both children. Mother's second assignment of error is overruled.

Assignment of Error Number One

> "THE TRIAL COURT ERRED WHEN IT FAILED TO APPOINT A PSYCHOLOGICAL EXPERT, AT STATE EXPENSE, FOR INDIGENT MOTHER TO AID IN THE PREPARATION OF HER DEFENSE, WHEN HER MENTAL HEALTH WAS CRUCIAL TO THE TERMINATION OF HER PARENTAL RIGHTS. THIS FAILURE VIOLATED MOTHER'S CONSTITUTIONAL RIGHT TO DUE PROCESS."

Assignment of Error Number Three

"MOTHER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, VIOLATING HER RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."

{¶28} Mother's first and third assignments of error will be addressed together because they are closely related. Through her first assignment of error, Mother maintains that, because CSB based part of its case against Mother on her chronic mental health problems, and the trial court ultimately based its permanent custody decision regarding M.C. on her mental health issues, the trial court should have appointed her an independent psychological expert to assist her in preparing a defense. She concedes that she never requested the appointment of an independent expert, and she does not argue plain error. As CBS correctly notes, Mother cites no authority for her apparent argument that the trial court was required to appoint her an independent psychological expert, despite her failure to request that it do so. Moreover, there is nothing in the record to indicate that Mother or anyone else disagreed with the diagnosis of the State's expert, which was based in large part on Mother's self-report and her prior history of suicidal behavior and mental health treatment. This Court is not willing to hold that the trial court had an obligation to sua sponte appoint an independent psychological expert under the facts of this case, particularly given that there is nothing in the record to suggest that the outcome of this case would have been any different if the court had appointed an independent expert for Mother.

{¶29} In a related argument in her third assignment of error, Mother asserts that her trial counsel was ineffective for stipulating to the admission of Mother's parenting evaluation, which was prepared by an expert who was not present to testify, and by failing to request that an independent psychological expert be appointed on her behalf. To establish a claim of ineffective

assistance of counsel, Mother must demonstrate that her trial counsel's performance was deficient and that the deficient performance prejudiced her case. *Strickland v. Washington* (1984)*,* 466 U.S. 668, 687. A "deficient performance" is one that fell below an objective standard of reasonableness. Id. at 687-88. To establish prejudice, Mother must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694.

{¶30} To establish prejudice regarding the admission of the parenting evaluation, Mother must demonstrate a reasonable probability that the trial court would have reached a different conclusion about her chronic mental illness without the admission of the report. Further, she must demonstrate that an independent expert would have disagreed with the diagnosis in the expert report, testified favorably on her behalf, and, as a result, the trial court would have concluded that R.C. 2151.414(E)(2) had not been demonstrated by the evidence. See *In re Ohler*, 4th Dist. No. 04CA8, 2005-Ohio-1583, at ¶28. Mother has not made such a demonstration on appeal.

{¶31} In fact, there was ample evidence aside from the parenting evaluation to demonstrate that Mother had been properly diagnosed with borderline personality disorder. To begin with, Mother seemed to accept that her diagnosis was correct, as she testified that she had been diagnosed with borderline personality disorder and that she had been working with her counselor to specifically target the behavioral symptoms of that disorder. Mother's counselor, who also has a Ph.D. in psychology and testified at the hearing, explained how Mother's behavior over the course of her lifetime, as reported to her by Mother, was entirely consistent with the diagnosis of borderline personality disorder. As explained in detail already, the evidence about Mother's behavior throughout the hearing further supported the diagnosis of the

expert who prepared the parenting evaluation. Consequently, Mother has failed to demonstrate that she was prejudiced by her trial counsel stipulating to the admission of the parenting evaluation or by failing to request the appointment of an independent psychological expert. Mother's first and third assignments of error are overruled.

III

{¶32} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

CARR, P. J.
DICKINSON, J.
CONCUR

APPEARANCES:

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.